**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:07-CR-12-TS |
| | ) | |
| JOSEPH LEWIS | ) | |

**OPINION**

The Defendant, Joseph Lewis, has moved for a new trial pursuant to Rule 33(b) of the Federal Rules of Criminal Procedure. He contends that he is entitled to a new trial because the government did not reveal that one of its witnesses had a felony conviction for dealing cocaine.

**BACKGROUND**

On January 23, 2007, three men robbed the Tower Bank located at 4403 Lahmeyer Road in Fort Wayne, Indiana. On February 22, 2007, a federal grand jury returned a two-count indictment against the Defendant charging him with armed bank robbery and using and carrying a firearm in connection with the robbery, or aiding and abetting the same.

On September 4, 2007, the Defendant's trial began. The government presented the testimony of bank tellers, police officers, a sales representative and technician for a global positioning system (GPS) device used by the Tower Bank, and a crime scene analyst, among others. Additionally, the government called Kenyatta Lewis as a witness. Kenyatta is the Defendant's first cousin. Kenyatta testified that he lived at 4217 Darby Drive, the house where police found three men, including the Defendant, after the robbery. He testified that no one, including the Defendant, had permission to be at his house on the day of the robbery and that he was at work from 7:00 AM to 4:30 PM. He arrived home with his wife and young child to find

police outside his house, and then gave the police consent to search his home. Kenyatta also testified that the Defendant may have still had a garage door opener that Kenyatta gave him at Thanksgiving when his family went out of town and the Defendant was at his house. He stated that he could not recall if the Defendant returned the garage door opener. Later, on cross-examination, Kenyatta stated that he did not give the Defendant a garage door opener and that his testimony was that he did not recall giving him one. Kenyatta also testified that one of the garments of clothing found in his house (believed to have been worn by the third bank robber), a size 2XL tan sweatshirt with a dark stripe down the sleeve, belonged to him. The sweatshirt was consistent with the clothing worn by the robber that was captured by the bank's surveillance camera entering the bank.[1]

At trial, the jury heard evidence that the police were directed to the 4200 block of Darby Drive, which was only two miles from the bank, through the aid of the GPS device that was embedded in one of the money packs stolen from the Tower Bank. The police were directed specifically to the house at 4217 Darby Drive by fresh tire tracks leading into the garage. When the police finally gained lawful access to the house, they found the Defendant and two other men, who were identified as Dawan Warren and Dontrelle Moore. Police also found the broken GPS device from the Tower Bank, money from the Tower Bank, and clothing matching the description of the robbers' clothing, including knit masks. Most of the clothing, as well as a firearm, were found in a haphazard pile in the home's attic. One of the pairs of shoes found in the house corresponded to the footprint left by the bank robber who jumped over the teller

---

[1] The government claimed that the third robber, the one wearing the brown sweatshirt, was the Defendant. Government witnesses described the third robber as larger than the other two men. The jury was able to observe the physical appearance of both the Defendant and Kenyatta during the trial.

counter. The door into the house from the garage was splintered at the lock, as if it had been kicked in by force.

The car that police found parked in Kenyatta's garage was registered to the Defendant's wife. A vinyl glove found in the back seat of the car contained the DNA of Dawan Warren. The bank tellers testified that the robbers wore latex gloves.

That same day, the police interviewed the Defendant about his involvement in the robbery. The jury was provided with a copy of the video-recorded interview, but it was not shown in open court. The jury did hear testimony from government witnesses about certain recorded statements the Defendant made to police, such as his evolving story regarding what he knew about the robbery. The jury heard that the Defendant eventually admitted that he knew that the other guys, who he identified as the "little dude" and Dontrell Moore, who is his half-brother, were planning to rob a bank. He said that another individual, Corey Williams, was also involved. Futher, he admitted to driving around outside the bank the week before the robbery to scope it out. The Defendant told police during his interview that when he met up with Warren, Moore, and Williams on January 23, and they asked him to take part in the robbery, he said that he did not want anything to do with it. So instead of going to the bank with the others in the brown car, he drove to his cousin's house in his wife's car, where he had planned to go that day to watch cable television. But first, he drove with the brown car to an intersection that was less than one mile from the bank.

According to the Defendant, as soon as he arrived at his cousin's house and opened the garage door, Corey Williams sped up in his brown car and Moore and Warren got out and ran into the garage as Williams drove away and the Defendant closed the garage door. The jury

3

heard that the Defendant's account was that Warren then kicked in the door to the house and they all went inside. In accordance with this evidence, the Defendant requested, and the Court gave, an instruction to the jury that it should find him not guilty if it determined that he was "merely an accessory after the fact." (Court's Instr. No. 32; Sept. 6, 2007, Trial Tr. at 88.) The Court defined an accessory after the fact as one who, with knowledge an offense was committed, receives, comforts, or assists the offender with the intent to hinder or prevent the offender's apprehension.

The government presented evidence at trial regarding a brown Buick Century. This car was consistent with the car identified by the bank witnesses as the one used in the robbery. A brown Buick Century was found less than one mile from the bank (and within blocks of the intersection where the Defendant maintains he spilt from the brown car to go to his cousin's house). The owner of the car testified that it had been stolen from outside her home on January 19, the week before the robbery. She also testified that the vinyl glove found on the front passenger floorboard did not belong to her.

On September 6, the jury found the Defendant guilty of Count 1 of the Indictment. The jury acquitted the Defendant of the firearm charge.

On September 18, counsel for the government provided the Defendant's counsel with Kenyatta's criminal history. The government indicated to defense counsel that she had inadvertently failed to disclose Kenyatta's conviction for dealing cocaine prior to or during the Defendant's trial.

4

## DISCUSSION

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. A motion for new trial is warranted where the evidence "preponderates so heavily against the verdict that it would be a manifest injustice to let the guilty verdict stand." *Unites States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989).

Under *Brady v. Maryland*, the prosecution has an affirmative duty to disclose evidence that is both favorable to the defense and material to either guilt or punishment. *Kyles v. Whitley*, 514 U.S. 419, 432–34 (1995); *see also United States v. Bagley*, 473 U.S. 667, 674–75 (1985); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). When the defendant alleges that the government committed a *Brady* violation, he is entitled to a new trial if he can establish: "(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." *United States v. Gillaum*, 372 F.3d 848, 858 (7th Cir. 2004) (quoting *United States v. Silva,* 71 F.3d 667, 670 (7th Cir. 1995)).

There is no dispute that Kenyatta's conviction, which the Defendant could have used to impeach him, was favorable to the defense. *See Giglio v. United States*, 405 U.S. 150, 154 (1972) (holding that impeachment evidence falls within the *Brady* rule); Fed. R Evid. 609 (allowing the admission of evidence that a witness has been convicted of a crime to impeach the witness). Thus, the second prong of the test has been satisfied.

There is also no dispute that the government failed to inform the Defendant of this conviction until after the trial ended. However, evidence is only "suppressed" for *Brady* purposes if "(1) the prosecution failed to disclose evidence that it or law enforcement was aware of before it was too late for the defendant to make use of the evidence, and (2) the evidence was

5

not otherwise available to the defendant through the exercise of reasonable diligence." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001); *United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992) (holding that "when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim") (quoting *United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980)). The parties dispute whether the suppression prong has been met.

### A.     Suppression of Evidence

The government disputes the second prong of the suppression element, arguing that the evidence "could have been discovered with reasonable diligence by defense counsel." (Govt. Resp. 3.) The government notes that Kenyatta talked with defense counsel the week before trial and that he is the Defendant's first cousin. Thus, the government's position appears to be that defense counsel could have asked Kenyatta Lewis about potential impeachment evidence, and should have done so.

The Court does not find that a reasonably diligent defense attorney would have necessarily been able to extract from the government witness that he had a felony conviction. In *Boss v. Pierce*, the Seventh Circuit held that information from the defendant's own witness was not available to the defense for *Brady* purposes. 263 F.3d at 740 (noting that a witness may be uncooperative, reluctant, forgetful, or incomplete). The government's argument does not actually address defense counsel's diligence, i.e., whether or not he asked Kenyatta about any prior convictions. The government assumes that because defense counsel had the opportunity to talk to Kenyatta before trial, but did not know about his conviction, that he must not have inquired

6

about his prior convictions. But defense counsel may have asked and simply received an inaccurate response. There is no record concerning this point. In any event, the Defendant cannot be charged with the responsibility to become aware of information that may not be forthcoming.

A conviction, however, is not simply information in a witness's head. It is available through official documents. Therefore, the Court must also discuss whether the conviction would have been available to the Defendant, in the exercise of due diligence, by some other means. The government does not present any argument regarding what these other means could have been or if they would have been available to the Defendant. In fact, neither party makes any effort to analyze the case law on this point and the record is incomplete.

For example, there is no evidence in the record as to when the government knew that Kenyatta had a prior conviction. *United States v. Moore*, 25 F.3d 563, 569 (7th Cir. 1994) (holding that there was no duty on prosecutor to use due diligence to discover government witness's prior conviction). "*Brady* prohibits suppression of evidence, it does not require the government to act as a private investigator and valet for the defendant, gathering evidence and delivering it to opposing counsel." *United States v. Tadros*, 310 F.3d 999, 1005 (7th Cir. 2002). However, given the nature of the government's admission, that it inadvertently failed to disclose the conviction, the Court assumes that the government knew about the conviction before the Defendant's trial. Thus, the fact of Kenyatta's conviction was within the prosecuting attorney's knowledge.

Generally, information known to the government about a witness' criminal history is suppressed for purposes of *Brady* if it is not revealed to the Defendant. *See, e.g., Crivens v. Roth*, 172 F.3d 991, 997–98 (7th Cir. 1999); *United States v. Lockhart*, 956 F.2d 1418 (7th Cir. 1992)

7

(finding no suppression of witness' criminal conviction because the government did not know of the conviction). But there is also some precedent in support of the notion that even though the government is aware of a conviction, the government does not suppress the conviction if the Defendant had access to it through other means and was aware that it might exist. In *United States v. Senn*, 129 F.3d 886 (7th Cir. 1997), the Seventh Circuit held that the government's failure to provide the defendant with a witness's complete criminal record did not constitute suppression of *Brady* material. However, in *Senn*, the defendant knew before trial that the government witness had an extensive criminal record and that the record the government provided was incomplete and confusing. 129 F.3d at 892. When the defendant requested criminal records from local law enforcement, he received them without difficulty. *Id.* The court noted the ease with which the defendant had obtained the information and that the government was not required to conduct an investigation for the defense. *Id.*; *but see United States v. Auten*, 632 F.2d 478 (5th Cir. 1980) (holding that prosecutor's failure to run criminal records search on key government witness did not absolve government of duty to disclose information that was readily available to it).  The court did not "rule out the possibility that there may be cases in which the government violates *Brady* by misleading the defense regarding the availability of otherwise readily obtainable *Brady* material," but found that the government did not purport to provide the defendant with comprehensive information. *Id.* at 892–93.

Here, there is no record of what the government told the Defendant regarding Kenyatta's criminal history. The Court is not aware whether the Defendant requested this information, and if so, the response he received. However, neither is this a case where defense counsel simply failed to follow up to obtain more details after being alerted of possible favorable evidence. There is

8

nothing in the record to indicate that the Defendant should have been aware that Kenyatta may have had a criminal record. His anticipated testimony centered around whether the Defendant had permission to be in his house on the day of the bank robbery while he was at work. The government's theory was that the robbers went to Kenyatta's house after the robbery because they could get into the house using a garage door opener that the Defendant took from Kenyatta without his knowledge. The Defendant's theory of the case was that he was just resting at his cousin's house when a car dropped off two men who had just robbed a bank, and that they forced their way inside the house. There was no hint that the government or the Defendant believed that Kenyatta was involved in the robbery or that he would have a criminal record.

Because the government had knowledge of Kenyatta's felony conviction and there is no evidence that the Defendant should have been aware of this fact or had ready access to this information, the Court finds that the government suppressed favorable impeachment information for purposes of *Brady.* Nevertheless, this does not constitute a violation of *Brady* and a right to a new trial unless the suppressed evidence was material to an issue at trial. *See Strickler v. Greene*, 527 U.S. 263, 281 (1999) (stating that "there is never a real ' *Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict").

**B.     Materiality of Evidence**

Evidence is material under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome" of

9

the trial. *United States v. Bagley*, 473 U.S. 667, 682 (1985).

The Defendant argues that if he had known about Kenyatta's conviction, he would have further pursued whether Kenyatta provided the Defendant with a garage door opener, as Kenyattas' testimony on this point was already shaky. Further, he would have asked him about his criminal record and asked the court to caution the jury regarding his credibility. He argues, "[i]f the jury believed that Joseph Lewis had prior access to Kenyatta's garage, it would have made his statements to the police, that he had been at Kenyatta's house resting when the bank robbers showed up at the door and demanded entry, more plausible." (DE 76 at 6.) He argues that "[t]he jury was surely influenced by Kenyatta's statement that he did not give Lewis the garage door opener." (*Id.*) The Defendant submits that Kenyatta's credibility was critical.

The government's response to the Defendant's argument is that he ignores the "overwhelming mountain" of evidence in support of his conviction. (DE 77 at 3.) The government points to the testimony of the bank tellers who described the first robber as tall and slender, the second robber as shorter with a medium build, and the third robber as large. The tellers also described some of the clothing worn by the robbers. The government notes that the GPS unit led police to the 4200 block of Darby Drive within minutes of the robbery and that particular attention was drawn to 4217 Darby Drive. When the police gained access to the house, they found Dawan Warren, Dontrell Moore, and the Defendant inside. Police believed that the Defendant met the description of the large man, that Moore met the description of the tall, slender man, and that Warren met the description of the medium built robber. Police also recovered from the home two-thirds of the money that was stolen from the Tower Bank, a firearm, clothing fitting the description of the clothes worn by the robbers, and pieces of a

10

broken GPS unit. The government argues that, upon the weight of this evidence, even if the jury discounted Kenyatta's testimony entirely, the evidence points to the Defendant's guilt and makes a different outcome highly unlikely.

In his reply brief, the Defendant appears to shift the focus of his argument away from the garage door. He argues that Kenyatta admitted during his testimony that one of the articles of clothing found in the house and identified as being worn by a bank robber belonged to him. He argues that this admission, along with the prior conviction, "could well have created a reasonable doubt regarding Joseph O. Lewis' involvement in the bank robbery as opposed to Kenyatta Lewis' involvement." (DE 78 at 2.)

The jury in this case was faced with determining, from its consideration of all the evidence, what role the Defendant played in the Tower Bank robbery on January 23, 2007. The jury could either believe that Moore and Warren forced themselves into Kenyatta's house immediately after robbing the bank, as the Defendant maintained, or that the Defendant was the third robber in the bank, as the government argued.[2] The jury could also believe that his involvement fell somewhere in between these two divergent scenarios. For example, if the Defendant decided not to go to the bank, but then knowingly assisted Moore and Warren by allowing them safe harbor in his cousin's house, he would have been an accessory after the fact—and not guilty of the charged offenses—as the jury was instructed. Obvious from its verdict is the fact that the jury believed his complicity in the crime went beyond meeting up at Kenyatta's house (willingly or not) after the robbery.

---

[2] There is no serious dispute, for purposes of this case, that the other two occupants of the house robbed the Tower Bank. Moore and Warren were each charged in separate indictments. The disposition of those cases is not relevant to the instant matter.

11

The Court must assume that Kenyatta's testimony that his cousin did not have permission to be in his house on January 23 had some impact on the jury's determination. And the fact that he had a prior conviction for dealing cocaine could have reasonably affected his credibility. However, even if the jury came to the conclusion that Kenyatta was not as surprised as he indicated upon learning that his cousin was at his house, it does not detract from the evidence linking the Defendant to the robbery. Even if the Defendant had a garage door opener because Kenyatta gave it to him, and even if Kenyatta gave the Defendant permission to be in his house, it does not diminish the evidence that he only went there *after* participating in a bank robbery. It does nothing to change the fact that a vinyl glove with one of the bank robber's DNA was in the car the Defendant drove to Kenyatta's house. Nothing presented at trial or on the DVD of the Defendant's police interview explains this. Further, the Defendant's position that he was regularly at his cousin's house while he was away contradicts the evidence that the door leading from the garage into the house had to be forced open. Nor does it explain how, if the Defendant was not with the robbers, they would know which residential house to escape to after the robbery. Kenyatta's willingness to let the Defendant say at his house while he was gone does nothing to diminish the fact that, by the Defendant's own admission, he was willing to scope out the bank during the planning stages of the robbery, and then only declined to participate when they were blocks from the bank.

The Defendant argues that if he had been aware of the conviction, Kenyatta's "criminal record" along with his admitted ownership of a piece of clothing worn by the third bank robber, "could well have created a reasonable doubt regarding Joseph O. Lewis' involvement in the bank robbery as opposed to Kenyatta Lewis' involvement." The Court does not agree. Certainly, the

12

Defendant could not have used the conviction "to prove the character of [Kenyatta] in order to show action in conformity therewith." Fed. R. Evid. 404(b). Thus, Kenyatta's conviction could not be used to suggest that he was the third bank robber. Kenyatta's claim to own the sweatshirt that was consistent with the one worn by the third robber, as can be seen on the surveillance picture, could not reasonably be considered evidence that he was the third bank robber. The jury was able to see Kenyatta and Joseph Lewis in person and judge their relative sizes and see that the man in the photograph was much bigger than Kenyatta. The fact is, both the sweatshirt and the Defendant were in the house after a GPS unit led police to it. Kenyatta was not. Further, trying to shift focus to Kenyatta ignores the Defendant's own story given to police during his interview—that it was Corey Williams who drove up to the house with Moore and Warren. Although the Defendant did not prove himself particularly credible throughout his interview with the police, given the evolving nature of his recount of the day's events, he never implicated Kenyatta despite numerous statements implicating Moore (his half-brother) and Warren.

The Court finds that, even with the conviction in evidence as impeachment material, there is not a reasonable probability that the result of the proceeding would have been different. Because the government's case was compelling even without Kenyatta's testimony, and because disbelieving his testimony would not detract from the other evidence that he was involved in the bank robbery as charged, confidence in the jury's verdict has not been sufficiently undermined to warrant a new trial.

13

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for New Trial [DE 71] is DENIED.

The Court will set a date for sentencing.

Dated: January 29, 2008.

                                       s/ Theresa L. Springmann
                                      THERESA L. SPRINGMANN
                                      UNITED STATES DISTRICT COURT